[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings:
On June 12, 1992, the Department of Children Youth Services (DCYS) filed a petition to terminate the parental rights of Lydia T., the biological mother of Saprena T., who was born at the Danbury Hospital on December 20, 1990. It alleges all four statutory grounds for termination, all of which existed for more than one year. Connecticut General Statutes, Sec. 17a-112(b).
The trial was held on September 1 and 22, 1992. DCYS called the following witnesses: Ms. Christine Lupke and Ms. Lisa Hill-Whittaby, both DCYS social workers; Dr. Ralph Welsh, Ph.D., a clinical psychologist who prepared an evaluation of the respondent mother; and*
the child's foster mother. The respondent testified, as did Ms. Irma Davis, her present drug counselor at Crossroads Drug Rehabilitation Center.
The following exhibits were entered into evidence by DCYS without objection:
Exhibit A — Report of suspected child abuse-neglect from Danbury Hospital, dated December 21, 1990.
Exhibit B — Evaluation by Dr. Ralph Welsh, Ph.D., dated June 14, 1991.
Exhibit C — Social Study dated May 29, 1990, filed with this petition by the treatment worker, Ms. Lisa Hill-Whittaby.
Exhibit D — Medical Records from Danbury Hospital. CT Page 330
The following exhibits for the child were entered without objection:
Exhibit 1 — DCYS form 136 from Danbury Hospital, dated February 8, 1991.
Exhibit 2 — Development evaluation from Newington Children's Hospital, dated August 3, 1992.
The respondent mother never disclosed the name of the putative father to DCYS, and his name did not appear on the child's birth certificate. He has had no contact whatsoever with DCYS, therefore, he was not named on the petition.
DCYS is required to prove one of these four grounds by clear and convincing evidence in order to prevail. Proof must be sufficient to convince the court beyond an average certainty that the respondent's rights as a parent should be terminated. In re Juvenile Appeal (84-BC), 194 Conn. 252,254, 255; In re Theresa S., 196 Conn. 18, 24.
A petition for the termination of parental rights consists of two phases, the adjudicatory phase and the dispositional phase. Connecticut Practice Book, Sec. 1042, 1044, 1059. There is no requirement that the adjudicatory phase and the dispositional phase should be held in different hearings, and a unified hearing is permissible. In re Juvenile Appeal (84-AB), 192 Conn. 254, 259 (1984). There is a different purpose for each of the two phases. In the adjudicatory phase, the court receives evidence to determine the validity of the allegations made in the petition, and the court is limited in receiving evidence to the events that occurred prior to the filing of the petition, in this case, June 12, 1992. The dispositional phase takes into account the best interest of the child, and the court is permitted to hear evidence and take into consideration facts and events to the date of the trial, September 22, 1992.
The four statutory grounds are as follows:
1. Abandonment
That the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the CT Page 331 welfare of the child.
2. Failure to Rehabilitate
That the child has been adjudicated neglected and uncared for in a prior proceeding and the parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of the child.
3. Parental Acts of Commission or Omission
That the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral, or emotional well-being.
4. No On-Going Parent/Child Relationship
There is no on-going parent/child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis for the physical, emotional, moral and educational needs of the child, and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interests of the child.
Adjudication: Facts found from December 20, 1990 to June 12, 1992.
I. Failure to Rehabilitate
Under this ground, DCYS must prove by clear and convincing evidence that this respondent mother "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, she could assume a responsible position in the life of the child. In re Luis C., 210 Conn. 157, 167 (1989). Personal rehabilitation means that a parent will be able to take a constructive and useful role in caring for the child. In re Davon M., 16 Conn. App. 693,695 (1988). This ground consists of three parts:
(1) The child was previously adjudged neglected or CT Page 332 uncared for, which in this case was March 5, 1991.
(2) The respondent failed to achieve personal rehabilitation.
(3) The age and needs of the child does not allow further time for her to rehabilitate. (Connecticut General Statute, Sec. 17a-112(b).)
In deciding this petition, the court may take judicial notice of the prior neglect adjudication. In re Mark C.,28 Conn. App. 247 (1992).
From the social study filed with this petition, and the testimony of Ms. Hill-Whittaby, the DCYS social worker who prepared it, as well as the testimony of Ms. Lupke, the DCYS intake worker, the following facts were undisputed.
Saprena T. was born on December 20, 1990 at the Danbury Hospital, and both the respondent mother and the child tested positive for cocaine. (State's Exhibit A.) The next day, Ms. Lupke responded to a call from the hospital social worker expressing concern that this mother would be unable to care for Saprena because she was disoriented and admitted being addicted to drugs. With this in mind, Ms. Lupke had the respondent agree to enroll in the hospital outpatient drug program and made four appointments for her in January. The respondent never enrolled nor attended any of them nor did she ever call the hospital or Ms. Lupke with any reasons for her failure to attend.
In January, 1991, she had returned to her parents' home with the child. The next month the parents called DCYS stating that the respondent was not caring for Saprena. On February 8, 1991, DCYS received a second referral from Danbury Hospital of suspected abuse. (Child's Exhibit 1.) In part, Dr. Rananatham, M.D., stated that "this mother is unable to help herself and is having a hard time dealing with a baby that has been exposed to coke in utero." She told him that the baby was crying all the time and was driving her crazy. The doctor believed that the screaming was a result of having been infected from her mother's use of cocaine, which made her a child with special needs. Shortly thereafter, DCYS filed the neglect petition, and an attorney was appointed to represent her. On March 5, 1991, she agreed CT Page 333 to the allegations in the petition, and the child was committed to DCYS for eighteen months. The next day Saprena was placed in a foster home where she has remained for the past twenty-one months. (State's Exhibit C — Social Study.)
During this seventeen month adjudicatory phase, the DCYS treatment worker had prepared four treatment plans with conditions that she enter drug rehabilitation, counseling, and attend parenting classes. She was given notice and also was told by the worker to see her at the DCYS office to review these plans. She never appeared nor did she fulfill any of the requirements for reunification. She did call Ms. Hill-Wittaby every four months to blame her for placing the child in foster care. At the trial, she admitted it was her fault and that this worker had done all she could to help her.
As to visiting with Saprena, she requested a total of six visits and made only three. During the past nine months, she has never visited nor has she ever called the foster mother asking about how Saprena was doing. She never acknowledged her birthday with a gift or card, nor did she even call the child. She ignored her at Christmas and other holidays. As a result, the respondent admitted at the trial that the child does not know who she is.
In March, 1992, DCYS received a call from a social worker from the University of Massachusetts Hospital that she had placed herself in a drug program there. She had gone several times to the hospital emergency room bleeding from the uterus. The social worker at the hospital reported to Ms. Hill-Wittaby that the respondent was four months pregnant and admitted using cocaine on a daily basis. She remained in the drug program for about one month and then returned to live with her parents in Danbury in late May, 1992.
In considering this ground, the court must consider the respondent's progress in rehabilitating herself as it relates to the particular age and needs of her child. In re Luis C., supra, 167. Dr. Rananaham's report of February 8, 1991 (Child's Exhibit 1) states that Saprena had special needs and that her screaming was caused by having been exposed to cocaine in utero. The foster mother*
brought her for treatment for her special needs to the Waterbury Child Guidance Clinic where she was evaluated as a CT Page 334 special needs child. The Newington Children's Hospital also evaluated her for her special needs which have been substantially overcome by the care and treatment provided by the foster mother. In June, 1992, this hospital found her to be healthy and developing normally for her age. (Child's Exhibit 2.)
The Newington Hospital psychological evaluation concluded that she had overcome her initial difficulties quite well and "is on a solid track of development in all parameters, including cognitive, motor, and emotional. This family is doing a superb job with her. . . ."
On the other hand, the respondent mother testified that she started using drugs at age eighteen and has been addicted to cocaine for over seven years. DCYS offered but she refused to enter a drug treatment program at Danbury Hospital in January, 1991, a month after Saprena was born. She never even showed up for the evaluations after appointments had been made by the DCYS social worker. At trial, Dr. Ralph S. Welsh, Ph.D., a state licensed psychologist, confirmed his written evaluation of June 14, 1991. (State's Exhibit B.) He concluded in his report that it would take an unusually long time for the respondent to reform her seven year cocaine habit. He estimated her chances as 1 in 20 and may never be able to parent this special needs child properly. Psychological testimony is rightly accorded great weight in termination proceedings. In re Nicolina T., 9 Conn. App. 598.
On July 16, 1992, the respondent voluntarily entered the Crossroads drug program in New Haven and testified she would stay there up to one year until she was cured of her addiction because she loves her child. She asked the court to give her one last chance.
The statute requires the court to analyze her rehabilitative status as it relates to all the needs of Saprena. Her rehabilitation must be foreseeable within a reasonable period of time. In re Luis C., supra, 157. Dr. Welsh testified that her chances of recovering from her addiction is about 1 in 20, at best 5 percent. Even if she should recover from her addition at Crossroads, it would take her many more months to establish a parent-child relationship since she admitted that the child did not know her now. And CT Page 335 if her behavior over the past seven years is an indicator of her future, she always put her needs for drugs ahead of Saprena's needs. She has not held a job for many years, has never owned an apartment, and she had relinquished guardianship and custody of another child to her parents. She involved herself in prostitution to sustain her drug habit. She has never been married and was expecting her third child in October, 1992. There is no substantive evidence that she even tried to rehabilitate herself nor that she will be rehabilitated within a reasonable time in the future. The evidence presented by DCYS was clear and convincing that this respondent has failed to rehabilitate herself within the meaning of the statute. DCYS has sustained their burden of proof on this ground.
II. Abandonment
DCYS alleged that the respondent had abandoned the child by her failure "to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." In In re Migdalia M., 6 Conn. App. 194 (1986), the court stated that "where a parent fails to visit a child, has no personal interaction with the child, and shows no concern for the child's welfare, statutory abandonment has occurred." The court is bound to consider whether the parent has shown any of the "minimal attributes of parenthood," including (1) expressions of love and affection for the child; (2) expressions of personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14, 15 (1981). During this adjudicatory period of seventeen months, this respondent requested six visits and made only three of them. During the past nine months, she never saw the child nor did she request any visits from DCYS. She did not visit or even call on the child's first birthday, nor did she send a card or gift. She ignored cards, gifts, or even telephoning the child for Christmas or other holidays. At trial, she admitted that the child would not know who she was now. What is a reasonable degree of interest under the statute is a question of fact for the court to decide and the focus to be considered is parental conduct. In re Rayna, 13 Conn. App. 23 (1987). Both the statute and the case law requires this respondent to CT Page 336 maintain a reasonable degree of interest in the welfare of her child. "Maintain" implies a continuing, reasonable degree of concern. Here, there were only three visits over the seventeen month period and none during the past nine months. The fact that the child does not know her is clear and convincing evidence, in fact, beyond any reasonable doubt that statutory abandonment has been established by DCYS. Except for a sporadic concern of telephoning the social worker every three or four months, she has failed to provide the child with any of the five "minimal attributes" of parenthood stated in In re Juvenile Appeal (Docket No. 9489), supra, 15. She has never provided a home for her, nor support, nor expressed any concern over her health or general well-being. She was only concerned with satisfying her own need to sustain a drug habit and did nothing for this child; therefore, DCYS has proven this second ground by clear and convincing evidence.
III. Acts of Omission or Commission
The third ground DCYS alleged for termination is that by reason of an act or acts of parental commission or omission, this child has been denied the care, custody, or control necessary for his physical, educational, moral or emotional well-being. Section 17a-112(b)(3) of the Connecticut General Statutes. The same evidence that DCYS presented to support the grounds of abandonment and failure to rehabilitate can be used to establish any other ground. In re Shannon S.,41 Conn. Sup. 145, 147 (1989). But when the original petition for termination was filed on June 12, 1992, the child had been in foster care since March 5, 1991, her entire life, except for the first three months. DCYS did not prove by clear and convincing evidence that the respondent's acts of omission established in the other two grounds affected this child's physical, educational, moral, or emotional well-being as required under this ground. All these needs were fortunately being met by the foster parents. Therefore, termination on this ground is denied.
IV. No On-Going Parent Relationship
The fourth ground alleged by DCYS, the absence of an on-going parent-child relationship, requires clear and convincing proof of the absence of a relationship "that ordinarily develops as a result of a parent having met on a CT Page 337 day to day basis the physical, emotional, moral, and educational needs of the child . . . and that to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interests of the child."
Initially, proof of a lost or displaced relationship required the child to have present memories or feelings for the parent, In re Juvenile Appeal (Anonymous), 181 Conn. 638,646. But now the child needs to have specific memories and positive feelings. In re James T., 9 Conn. App. 608.
In re Juvenile Appeal (Anonymous), supra, citing with approval in earlier decision in In re Juvenile Appeal,177 Conn. 648, 670 (1979), the court stated:
 It is reasonable to read the language of `no on-going parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings for the natural parent.
In re Juvenile Appeal (Anonymous), supra, 645-646.
The presence or absence of positive feelings on the part of the child is determinative. In re Jessica M., 217 Conn. 459
(1991); cf. In re Valerie D., 223 Conn. 492, 526-527
(1992). By the respondent's own admission at trial, the child does not know her.
From the testimony of the foster mother, the court finds that the foster parents are for all practical purposes her parents, meeting all of her emotional, moral, physical and educational needs. And to allow any further time to re-establish a parental relationship with her biological parent would be contrary and detrimental to her best interests. This child should not be deprived of stable and permanent caretakers any longer. These facts also proved the fourth ground by clear and convincing evidence. CT Page 338
Even though DCYS has proven three of the four grounds for termination of the respondent's parental rights, the court must consider and make written findings of the six factors specified in section 17a-112(d) of the Connecticut General Statutes.
1. DCYS did offer the mother entry into a drug treatment program, parental counseling, visitation and foster care. The respondent chose to ignore her drug problem. She only visited the child three times as previously discussed in this memorandum.
2. There were no court orders. DCYS did, however, have Dr. Ralph S. Welsh, Ph.D. do a psychological evaluation of the mother, and Newington Children's Hospital did a comprehensive physical and psychological evaluation on the child.
3. The only parents this child knows are the foster parents, and she is bonded to them. She interacts with the entire foster family She calls the foster mother "Mommy."
4. Saprena was born on December 20, 1990, and is two years old.
5. The mother visited the child only three times over the past seventeen months. She made no effort to overcome her drug addiction for the past seven years. She entered the Crossroads drug program on July 16, 1992, a month after this termination petition was filed. It is a case of doing little or nothing during the past seventeen months after it is too late for this child.
6. Neither DCYS nor any other person ever prevented the respondent from having a meaningful relationship with her child. Her own desire to satisfy her drug habit was the cause. Economic circumstances did not prevent her from having a meaningful relationship with her child.
Disposition: Facts from June 12 to September 22, 1992.
Even though DCYS has proven three of the four of the statutory grounds for termination, this court must also find by clear and convincing evidence that termination of this CT Page 339 mother's parental rights would be in the best interest of the child. In re Juvenile Appeal (83 BC), 189 Conn. 66, 79
1983).
The foster mother,* testified that her entire family loved Saprena and she returns that love to them. She has substantially overcome the special needs she suffered at birth from cocaine. The Newington Children's Hospital report (Child's Exhibit 2) stated that since being placed in this foster home, the child has done well developmentally, and has solid attachment patterns toward her foster mother. It ended by stating that "this family is doing a superb job." The foster mother testified that she and her husband are ready, willing and able to adopt her now. They are the only family Saprena knows.
After considering all the facts, the evidence is clear and convincing that termination of the respondent mother's parental rights is in the best interest of this child. Saprena deserves the security, love, and performance of a family like the foster family after being born under such distress and pain.
Therefore, it is hereby ordered that the parental rights of this respondent mother be hereby terminated. It is further ordered that the Commissioner of Children Youth Services be appointed statutory parent pursuant to section 17a-112(i) of the General Statutes so that this child can be placed for adoption as soon as possible. DCYS shall also submit a report to the court within ninety days from this judgment and annually thereafter until the adoption is finalized.
Entered at Danbury this 22nd day of January, 1993.
Petroni, J.